Good morning. Caleb Dalton on behalf of National Institute of Family and Life Advocates and SCV Pregnancy Center. Judge Rawlinson, I'll do my best to reserve about three minutes for rebuttal. We'll see if that happens. All right. May it please the Court. Abortion pill reversal is a lawful and life-saving treatment. It occurs only after a conversation and informed consent from a licensed medical professional. But the Attorney General is attempting to censor information about that so that that conversation never happens. The District Court erred by not stopping the censorship and by denying the preliminary injunction for at least two reasons. First, the District Court committed error, legal error, by applying the wrong standard for commercial speech in contradiction of this Court's holdings in INDB.com and Eriks and the Supreme Court's holdings in Central Hudson and Riley. Second, the District Court erred by taking sides in a scientific debate, something this Court warned against in Chamber of Commerce. And the California Court of Appeals in Bernard v. Planned Parenthood held is not even subject to the UCL or FAL. This Court should reverse and remand and instruct the lower court to grant the requested injunction. Counsel, could you specifically state how the District Court applied the wrong standard for commercial speech? Yes, Your Honor. In two ways. The first error was by not even going to what the Supreme Court in this Court instructed in IMDB.com, how you look at commercial speech in the first place. The first question is, does it propose a commercial transaction? The speech at issue here doesn't come close to proposing a commercial transaction. My clients don't offer anything for sale. They offer free services. Some of them don't even offer the services at issue in this case. They're simply providing information about it. So there's no commercial transaction being proposed. So is it your position that absent, and I'm not saying whether or not it was correct that there was a commercial transaction posed, but is it your argument that absent a commercial transaction being posed that there is no commercial speech? That's the first question that's to be asked. Some courts have indicated maybe if you weren't proposing a commercial transaction, but in close cases, let's say the Bolger case, for example, or Eric's, Eric's wasn't proposing a commercial transaction per se. It was information about nutritional supplements. So your answer to my question is no. It's not limited strictly to proposal of a commercial transaction. Not a universal rule. There could be close cases. But that's the first question that this court held in IMDB.com that you should ask is, is it proposing a commercial transaction? If it's not even close, you don't even go beyond that question. That's what this court did in IMDB.com. It didn't even apply the Bolger factors. It said because it's not a close case, you don't even need to go. What do we do about first resort then? I mean, I don't take your briefing to suggest that any intervening authority, Supreme Court authority, has undermined that. So we're bound by it. Certainly. First resort's a unique case in that it went through a really broad myriad of factors, and there's six specific distinguishing factors that make this very much unlike first resort. First of all, there's no employee compensation in there. There was economic motive because employees were being given bonuses specifically on their recruitment. So based on their speech, there was an economic motive for that speech. Second, the centers here made no concession of economic advantage. That wasn't the case in first resort. They made a concession of economic advantage. Third, there's no competitive marketplace for abortion, pill reversal. The court in first resort focused a lot on the competitive marketplace for medical services. According to the attorney general in his complaint against HeartBeat International, this is an extremely rare occurrence that a woman regrets their abortion, that they go even looking for this. There's not a competitive market. Why is that the right level of analysis? I mean, by that measure, you know, someone selling, anybody selling a unique product could claim that it's not commercial speech. I mean, isn't the correct mode of analysis the broader category of medical services? I don't think so, Your Honor, because we're talking specifically about the abortion, pill reversal speech at issue here. We're not talking about advertisements generally for medical services, which is another distinguishing factor. So how much does that turn on? So you're not asking for any different relief or analysis with respect to your members in the party who provide the progesterone therapy versus who simply advocate, encourage, inform people about it. So are you saying that a medical provider providing progesterone therapy just because the person doesn't have to pay for it because it might be covered by insurance takes it out of the realm of commercial speech? No, Your Honor. A for-profit medical provider that's advertising that specific service, that would be commercial speech. What about a nonprofit? I mean, there is money changing hands. It's just not, I mean, in other words, it would be odd, I think, to draw a line at commercial speech that nonprofits can't engage in commercial speech even if, for example, they're providing medical services that are reimbursed. I think that's right. Here's an example one way and the other, if you'll indulge me. One example would be a Goodwill, for example, that sends out a flyer and says, Here's three products we have, three couches that were donated. They're very fancy. Here's the price we're selling them for. Come to our store and buy them. That's commercial speech. It's advertising a specific product. Now, Goodwill may be motivated by their own goodwill, right, not by profit motive specifically there. But that's a traditional commercial advertising. So the third-party payer makes it not commercial speech? The transaction? I mean, that is the transaction. I'm just talking about the party and the members of NIFLA who are providers. All right, so Dex Media specifically said the advertisement has to be for your own product that you're selling. So our clients aren't selling any product. So that's why Goodwill is selling a product that would be a little more like… So that would result in a rule to say that commercial speech would not apply to any nonprofit provider of medical services? As long as there's a third-party payer for it? That seems quite sweeping. Are you trying to draw a narrow line? I think it's narrower, Your Honor. Here's a hypothetical that I think will demonstrate that. The hypothetical is that an environmentalist nonprofit, they post on Facebook, just like our clients do, and says a new study has come out that says using paper straws has caused a 5% reduction or a 5% increase in marine life in a local park. And it just so happens that those chapters of the environmentalist organizations give away free straws. Now, according to the Attorney General's theory, that's economic and proposing an economic transaction because they're promoting free paper straws. That can't be the case. It's the same thing, according to the Attorney General, if you advertise in any way that would then impact your fundraising in some form or another. Again, I want to focus on the subject. I'm just not sure what to do of the fact that we have seemingly differently situated plaintiffs in this case. I mean, as to the provider, why wouldn't under NIFLA their speech, the big NIFLA at the Supreme Court, why wouldn't their speech just be speech incidental to conduct if it's, again, providers who are providing information about medical services that they provide? Because the provider is doing it for free. If they were charging, it would be for commercial services. It would be economically motivated. It would fall under Central Hudson. It would fall under Eric's. So a lot really turns on this fact that it is a commercial transaction, that money changes hands. Absolutely. Central Hudson kind of describes the philosophical background behind the whole idea of commercial speech, and that being that it's more durable because the speaker has an economic motive. They're going to gain a profit from it. But here the speaker is getting reimbursed for the services they provide, again, in the case of the subset. Your Honor, that's actually not the case in our clients. For NIFLA and its members, they're not charging. They're not getting reimbursed even through insurance. Their services are completely free. So the people who provide the progesterone. That's an independent third-party pharmacy, Your Honor. That's not our clients. They're not selling or getting reimbursed for progesterone at all. It's completely free. Suppose that we think it does make a difference whether the entity is actually providing the service or not. What do we do with the fact that you're seeking an injunction on behalf of a group of some entities that do and some entities that don't? Neither you nor the Attorney General has suggested any way to break it out. But what would we do if we thought that it made a difference? Obviously, my position is that both are fully protected. I think the one that doesn't provide it is such an easy case. It's talking about a party that's posting information. They believe it's true, but they're not selling anything. They're not providing the service. There is no way, any link to any economic motivation that was central under Central Hudson or under this Court's commercial speech precedence. So that's the easy case. Certainly, I think the same principle applies when the service is being provided for free like NIFLA members do. So we're, again, talking about a service that's provided completely free. But even if it were a close case, and this is where I think Eriks and Bolger are helpful, we don't think you need to apply those. But let's say the provider who is offering this as a free service, let's say you consider that a close case, Eriks and Bolger provide the framework. So I'm really asking, I think, a civil procedure question, not a First Amendment question, which is if we think that it makes a difference and some of the entities are entitled to an injunction, but some aren't, you ask for one injunction that covers everybody, what would we do? My understanding is that it's on the Court's complete discretion to craft an appropriate injunction. Regardless of what a party asks for, the injunction can be crafted by the Court to address the specific issues in the way the Court wishes. But I do think Eriks does speak to that issue. And Eriks specifically, when you go to the economic motivation prong, requires that it be primary. The Attorney General didn't dispute that. And there's really no dispute that the primary motivation of our clients is not economic at all. They're not making money off of this. They're nonprofits. They're providing this service out of altruism, not out of a profit motive. So even if this Court were to think it were a close case under Bolger or Eriks, that primary economic motivation requirement that this Court held in Eriks is just not present here under the facts of this case. Why can't we get past, so we've got a three-part, for a former con law professor, a three-part test that's the first part of a four-part test. Why can't we get to the rest of the commercial speech pieces? The district court reached it. The Bolger factors? Beyond the Bolger factors to do the intermediate scrutiny, the central Hudson scrutiny. So you only get there if you first determine that it is commercial speech, and our contention is that it's not. So if you were to go there, then, of course, the burden falls on the Attorney General to meet intermediate scrutiny, and he can't do so here. How much turns on the fact that he doesn't appear to have done so? I mean, in terms of just the presentation. It's dispositive, Your Honor. But that doesn't prejudice any future. I mean, this is here on a preliminary injunction, so the Attorney General presumably could develop a satisfaction of the central Hudson test if that's what it was on the merits. Yes, Your Honor. But on the current record, the Attorney General has waived. I think it's unique when the government has that specific burden. That's why it's waived. The lower court can't just craft a justification that wasn't provided by the Attorney General. So the Attorney General has suggested, and I guess this was an issue in the other case, but has suggested that the unfair competition law and false advertising law only apply to commercial conduct, which I guess raises the question of whether the conduct or speech, whether your activity, is a violation of state law at all. And that, in turn, raises the question of, you know, is Pullman abstention appropriate here? I mean, should we let the state courts tell us whether the state law even applies before we resolve this federal constitutional question? It's not. And, Your Honor, there's definitely been a back and forth in footnotes on that particular issue of does this apply, is there a standing issue, and there's not for this reason. If Susan B. Anthony resolves this question, we don't think the UCL or FAL should apply at all in this case, but the Attorney General has applied it this way. And that's why our clients, their speech is chilled. That's not really. I don't take this question. I guess I'm interested beyond the standing issue. Standing is quite liberal. But with respect to abstention, we're on the eve of a trial and subsequent appeals that might establish. You've cited state law that suggests that it may not apply to this. So why should we weigh into this area if we're about to get an answer?  And just for the record, my understanding, I'm not on that part of that case, but my understanding is this trial has been pushed back to the spring at some time. So it may be more time that our client's speech is chilled. But not only that, Pullman abstention is inappropriate here. If you look, it hasn't been raised by the Attorney General, obviously. But also, Sprint talks Sprint versus, I forget the name of it. I think it's a 2012 case where the Supreme Court was addressing abstention. But very clearly admonished the lower courts that they have an obligation to hear the cases that are before them. And that younger, I'm thinking more specifically of younger abstention, but abstention in general is to be used very sparingly. What about certification? I don't think there's any need for this. And specifically why, and one of the reasons, you know, the Attorney General harps on that our clients took a year to file this case. One of the reasons was we were waiting to see if it would be dismissed in the state court. The state court ruled against the defendants on their demur in that case. So it is going forward. There already has been a state court ruling saying that the state court, the Attorney General's case can proceed. So we already have direction from the state court in this case that they can apply the UCL and FAL in this manner, even though we disagree with that. That's the direction of the state court in this case already. If there are no further questions, I reserve the remainder of my time for rebuttal. Thank you, Counsel. Good morning, Your Honors. Good morning. May it please the Court, Erica Connelly for Defendant Attorney General Rob Bonta. The appellants here have asked for an incredibly broad injunction. They have sought to enjoin the Attorney General from enforcing California's consumer protection laws, specifically the unfair competition law and the false advertising law against the use by NIFLA, its members, and SCV of the terms reverse or reversal of the phrase that APR is safe and effective in any context. And the district court properly rejected that request, and this court should affirm. Don't they face liability under state law in all of those contexts, though? Your Honor, I think it's important to first reference what our enforcement action actually alleged in the state court action. Yes, we have addressed reverse and reversal. Yes, we have addressed effectiveness. And we did not actually bring a claim saying that the statement of safety created liability. What we said was the failure to disclose the more serious side effects that are possible with APR, as suggested by the 2019 Cronin study, makes the representations that they make about the more minor side effects about progesterone. But I guess I'm reading the complaint, and, of course, there are the statements that are identified, but then it says, as a good pleader would, including but not limited to, some of this stuff. HBI touts on multiple Web pages that initial studies have shown that the success rate for APR is 64 or 68 percent. Does the attorney general believe that if they may or may not be the statements at issue here, but that simple reporting out of the fact that there is a study linking to the study would be false or misleading commercial speech? Your Honor, I think really the issue, both in the enforcement action and in this case here, is whether the speech is, in fact, commercial. Now, I'll represent. Well, this is granting that it's commercial. How is that false or misleading if they say that the study says what it says? Sorry, Your Honor, I misunderstood your question. The study does not say 64 to 68 percent. The study says that the overall reversal rate is 48 percent. What the study says is that in certain subsections, in oral progesterone administration, it is a 64 percent success rate that arises out of a population of 31 individuals. And then it also says that intramuscular progesterone has a 68 percent success rate. And yet the overall rate for all of the various administrations is 48 percent. What if they said that? I mean, 48 percent is, in the world of drug efficacy, there's lots of drugs that have been approved by the FDA as effective that have lower efficacy rates. Your Honor, our position is, though, that the study that even says 48 percent is not sufficient to even show that because of the way in which it was conducted and the flaws that are underlying it. What it is is a retrospective analysis. It's not a randomized controlled study. And even their expert. So what's, I guess, as a matter of First Amendment doctrine, why does that matter if they're reporting that a study says what the study says? It's truthful. I get that it may not be the full truth in terms of maybe it's misleading. But I guess I've struggled to find your best case on that question. Your Honor, I think on that point, looking to the cases that the D.C. Circuit considered involving FTC cases where there's a lack of substantiation. When we're dealing with commercials. Like the Palm Wonderful case. Exactly, Your Honor. And Bellion. So in Bellion, I think that's a very good example where a vodka producer was trying to add to its label that certain studies supported that its particular mixture that it wanted to add to the vodka would improve or prevent damage to the DNA that is caused by alcohol. They presented to the FTC 112 different studies. And then the FTC, excuse me, not the FTC. It was the administrative board that deals with the labeling involving alcohol products. But in the course of that, that board conferred with the FDA, determined that most of that evidence was insufficient. Those were still studies, but they were case series. They had issues where the dosages were not explained. It was weak scientific evidence. And so the FTC, the TTB at issue in that case, refused to allow Bellion to put that representation on its labels. And the D.C. Circuit affirmed, finding that there was no violation of the First Amendment because the speech is commercial. And when there is insufficient scientific evidence, and that scientific evidence is too weak to establish the claims that are placed in, it is misleading speech. Okay, can I ask you to go back to the antecedent question of whether this is commercial, and in particular for the NIFLM members that don't provide this service at all but are just sort of promoting it. The service exists. It's provided by people other than us. We think you should use it. How does that qualify as commercial? Well, Your Honor, I think the commercial speech inquiry, first I would say, the record shows that a lot of the statements that are made, even by the entities who don't offer APR, are proposing a commercial transaction, which is the medical treatment. That is the inquiry at issue here. But it's not theirs. Well, I will just make one point in the factual record, which is that both of the entities that NIFLM referred to and included with specific facts in this case have both said they intend to offer APR absent our enforcement action. In other words, if this injunction is put into place, they intend to offer this service. Now, if they never, for any of the entities that don't offer the service at all, I would note that there's probably a pre-enforcement standing issue that we flagged in our footnote, because the UCL and the FAL prohibit business practices, and they prohibit commercial speech. If they're just offering information more generally, that's not commercial speech. It's not something that comes under the UCL or the FAL. So it's your view that the entities that don't provide the service and don't intend to provide the service are not subject to enforcement action under state law? Your Honor, I think our position is that even if they don't provide the service, they can still be engaging in commercial speech by advertising the service. Suppose there's a Second Amendment advocacy organization that runs ad campaigns that say, like, you know, Second Amendment is great. You should protect your family by owning a firearm. Logically, the only way you could do that is by buying a firearm, which would be a commercial transaction. But they don't sell firearms. They're just promoting the idea of firearms ownership. I guess on your theory, that would be commercial speech? No, Your Honor. So how is this different? Yes, Your Honor. The record before the district court and before this court is not as broad as, if you regret your abortion, you know, let me put this another way. What the evidence before the district court showed is that they are actually advertising a specific service, abortion pill reversal. So in the hypotheticals that you're providing, the difference would be as if an advocacy organization said, you should buy this gun because this gun will protect you. In our view, that's commercial speech. You are advertising that speech. And it's even more important in the health care setting. Now, what's your case? I have questions about First Resort and Eric's as well. But where is the Supreme Court held that, that advertising someone else's product where you don't have an, I mean, right, if we stipulate, and I think there's some question about whether it was established in the record, there wasn't an economic motive on behalf of the plaintiffs. If that's the case, when would that ever be commercial speech? Well, let me go back to the first part of your question, which is about this issue of advertising a product that's not your own. Boulder itself actually addresses that situation in footnote 14. It talks about, and cites approvingly, too, an FTC case in which a trade association was advertising eggs and was saying the statement that there was no evidence of collective impact. Well, yeah, that was the Seventh Circuit case from 77, I think. But that case, they were, it was a trade membership, right? In other words, it was a trade association. They were, and maybe you're seeing analogies to a trade association here, but then I think we're running into the issue that Judge Miller and I have identified, that they're not all engaged in commerce. So the logic of the egg case was that the egg sellers all were engaged in commercial transactions and had simply paid fees to a trade association to do the advertising work for them. Does that work when, I think it's undisputed, some or most of NIFLA's members aren't engaged in the provision of progesterone at all? I wouldn't, I would say some. I would not concede that it was most. I think that all that it says in the record in the verified amended complaint is that some do not and some do. So I just want to make that point. I know I'm being a little bit specific, but just want to make that point. But I think that when you're talking about, so I think stepping back and looking at the purpose of the commercial speech protections, they first arose in Bigelow v. Virginia. And that was because it was truthful commercial speech, and that was the first time that there was protection for commercial speech. And the purpose of the commercial speech protection is to ensure that information goes to consumers accurately. That's why government entities and government officers like the attorney general can ensure that the flow of commercial information. Those were still first-party, weren't those first-party transactions? Yes, Your Honor. But when you're talking about something like a medical treatment here, and they are advertising a specific product with what we believe the record shows are false and misleading statements, they are advertising a particular product. And in this situation, that is the commercial transaction. So in some ways, you don't need to get to Bolger because it's not a closed case. But even if you did get to Bolger, all of those factors suggest that commercial speech is the right outcome here as the district court found it. What do we do about Bernardo? I mean, what's the attorney general's position on the fact? I get that it's not a First Amendment case. It's a consumer case. It is a First Amendment case as well as a consumer case. Obviously, it's California state court. But Bernardo, I think, really highlights is the fact-intensive inquiry that is required when you are considering whether speech is commercial or not. I took it, I guess, instead to result in an inquiry about whether it's false or misleading, which, again, is downstream from the commercial threshold. Your Honor, if Bernardo first goes through whether the particular websites at issue actually proposed a commercial transaction or were informational. Because although it's the same – so the analogy would be here if NIFLA had a separate website that said, information about APR or progesterone therapy, here's some studies, and did not end on that webpage with an ask or an offer. Your Honor, I think that would take it out of the commercial speech context and into an informational context. The example in Bernardo I think is quite telling. There, Planned Parenthood provided a webpage with its stated position on the link between abortion and breast cancer. And it provided the studies that opposed its position. So what do you do with – this is at page 8 of their reply brief, a screenshot. Maybe there are a couple of different issues here, but part of it is something on social media that says, a new abortion pill reversal study has been published in a peer-reviewed journal. Its findings show that reversal success rates were 64 to 68 percent. I mean, how do we slice and dice that when there might be multiple things going on in terms of offers, recommendations, information? How do we parse that? Because I think the theory behind Bernardo and others is that an organization is entitled to do both. Yes, Your Honor. But first off, I'll say that this – in our position, this study doesn't actually say 64 to 68 percent. But leaving that aside – Right, but of course, if it's – right, if it is false, you have done – the state has not argued that it would satisfy even intermediate scrutiny, and the Supreme Court hasn't told us whether non-commercial false speech, exactly what level of scrutiny is. So that doesn't win. You're right, Your Honor, and I didn't mean to evade your – On the commercial, but yeah, let's talk about the commercial side. But to the commercial speech element, first off, I'll note this particular screenshot comes from Alternatives Pregnancy Center. That is the entity that, in fact, offers this, the APR service. And, in fact, you know, if you look at the statement underneath that, what they state is – the appellants state, if Alternatives charged patients for APR services, perhaps this informational post could be construed as proposing a commercial transaction. So what they are saying is only the fact that there is no economic motivation does this speech no longer remain commercial. But the commercial speech inquiry does not turn on economic motivation. Well, I guess that's the question coming to First Resort. Why shouldn't we read First Resort the same way we read it in Eriks, which is it was about employee compensation, but that it reflected a general principle that the primary economic motivation is the case? Have you argued that NIFLA's motivation here is primarily economic? Your Honor, we have not argued that it is primarily economic, but that is only one of the three factors that are at issue in Boulder. And what we have instead is strong showings that the speech is an advertisement for a specific product. The fact that it is – that there is some economic motivation, we put that in the record, but not – but that it is not necessarily the primary motivation. And I'll note this is on a preliminary injunction record. We obviously have our – you know, we'll do – we'll continue to do discovery on that particular issue. But, you know, I think there's – this Court's recent decision in Pharmaceutical Researchers v. Stolfel, which came out in August, highlights that the commercial speech inquiry does not turn on economic motivation itself. That decision, which was about compelled speech under an Oregon statute that required certain pharmaceutical companies to affirmatively disclose their pricing, in a footnote that the Court there noted that there are many instances where the speech can be compelled without any economic motivation. It is, in fact, speech that could be contrary to the economic motivations of the entity. But because it describes a commercial transaction – But I guess, I mean, maybe the answer is that in your view – I mean, in the ordinary understanding of commercial transaction, a commercial transaction is one in which, like, there is some exchange. It doesn't, as a sort of ordinary language matter, capture very well the idea of somebody giving something away for free, which is what they're – what they're saying that they're doing. Right, so – and I guess, is your answer to that just first resort, or – I don't think it's just first resort. I think it's first resort, yes, but I think it's also bolger, which pointed out that, you know, in the situation of where there's speech that proposes this kind of commercial transaction – Sorry, let me back up. Speech is commercial not only when it proposes a commercial transaction, but when it describes a commercial transaction, that's still full. Well, how do you square that with XCOR, where the state was requiring disclosures of matters of public interest, but they were being required to disclose it. They didn't have an economic interest to actually summarize it in the way the state wanted. Your Honor, it's an interesting question, and – There's a little tension, to be honest, across these line of cases. Yes, absolutely. We don't think that XCOR is – XCOR is readily distinguishable from the facts of this case, though. This is not a situation where anyone is – this is a situation where they are advertising a particular medical treatment. And so the underlying core principles of commercial speech is to protect consumers, not just to ensure the speech rights of the commercial – the entity that is advertising. And I'll just note, even if the speech is rendered commercial, it still is subject to constitutional protection. Right, but I guess the problem is that you haven't made a central Hudson – you haven't presented a central Hudson argument. You've left the district court and us, I think, with the duty that we can't undertake usually under heightened scrutiny to do the balancing, if we get that far. Well, Your Honor, I don't think that the – I think the interest here – If it's even potentially misleading, right? Yes. You know, I think if the district court correctly held that even if the speech was potentially misleading, intermediate scrutiny was satisfied in part because the – as this court has acknowledged, the Attorney General surely has a substantial government interest in protecting accurate medical information. But can we – can we even do that for the state? We can do that on a rational basis, but your friends say that, you know, if you haven't presented the state's interests, it's not our job to come up with them. Your Honor, I would note that you can affirm on any basis on which the district court held. Well, any grounds supported by the record, and I think the argument here is you haven't made your record. Your Honor, I believe we have made that record because we have put forward that this speech is an advertisement using – that these statements are advertisements using – Not on the Bolger factors, but if we find it potentially misleading on the central Hudson. Yes, but, Your Honor, I don't believe that there is particular facts that we would need to add into the record to show that we have a substantial government interest in protecting accurate information. Well, what about the tailoring? Has the state done anything to – if the state – right? There are studies here suggesting this can be quite dangerous in some circumstances, as other medical procedures may be. The state hasn't taken any action to prohibit or constrain or actually regulate the provision itself, outside it has it, outside of addressing the speech. Your Honor, we have not, and that's – we have not done anything to regulate the procedure itself. That's, I think, a really critical issue in this case. There is a difference between the standard of medical evidence that is required to determine whether a particular course of treatment is appropriate for a particular patient in a particular context. We are not trying to interfere and are not interfering with that particular determination. Isn't that the case? Every person who sees these communications, these messages, and decides to pursue this treatment will have that provider and that conversation. That's just the end result of it. So if that requires a higher evidence standard to regulate that relationship, why would it require a lower evidence to regulate speech about that process? And, Your Honor, I'm over time, so I'll answer your question and then I will sit down. But what I would say, you know, on that point is, first off, advertisements of medical – for medical treatments infect the informed consent process. They – and they are the harm that is caused. That's recognized by the FTC and, as we put in our brief, and under California law, that it's that initial draw-in of an individual that is a harm to them. And so what we are saying is you cannot advertise that a treatment is safe and effective and that it does something that the scientific evidence does not establish that it does. And that is well within the appropriate – the First Amendment-like strictures that govern us. Any other – if there's no other questions, I'm – Thank you. It appears not. Thank you. Rebuttal. Thank you, Your Honor. This Court had a few questions regarding economic motive and whether or not that was clearly established in the record. I would point the Court to paragraph 38 of the complaint. This is in the excerpts of record at 1495 as well as 1498. In addition – and just to be clear, that's a verified complaint, so it's sworn testimony. In addition to the declaration of Heidi Matske at 9 excerpts of record 2097, which establishes that alternatives never charges for any of the services that they offer. What's our standard of review for dealing with a First Amendment preliminary injunction fact-finding by the district court? It's de novo under Junior Sports Magazines, Your Honor. In addition, there were questions about what's the standard for noncommercial false speech. I would point this Court to United States v. Alvarez. The Court held noncommercial false speech is fully protected. Strict scrutiny applies. At bottom in this case – Is that a plurality? I believe it is, Your Honor. At bottom, our clients wish to simply repeat the conclusions of peer-reviewed studies, and what the Attorney General is doing is censoring the ability of nonprofit organizations who make no money off of any of this, their ability to tell women about a potential option that could save their unborn child's life and could turn their life in a new direction. The declarations of Ettoria Foley and Ms. Exendine that are in the record demonstrate that this can really turn a woman's life around when they have this option presented to them, and it's something they deserve to have information about. Go ahead. Can I ask you to go back to first resort? I mean, there is the sort of employee compensation strand to it, but there's also, particularly in the discussion of the North Dakota case, Larson, there is sort of a strand of first resort that suggests that when you're advertising a medical service that we don't even really look at the third vulture factor. What do we do with that suggestion in first resort? I don't think that would be an appropriate reading of first resort. If we read it that way, it would conflict with Central Hudson, with Erickson, the entire kind of field of commercial speech, and I don't think that a court's required to read it that way. But in the medical space, it does seem like some of these cases are inflected by that. There's certainly that implication in first resort, particularly, and in the North Dakota case as well. But reading it that strictly and that narrowly would conflict with the commercial speech doctrines in Erickson, and this court isn't required to when you look at the multi-factor analysis that was at play in first resort and then how this court handled it in Erickson and determined that primary economic motivation was still required. This court shouldn't read first resort so broadly. It should read it consistently with the rest of commercial speech doctrine. Counsel, when we're talking about studies, does it matter whether or not the study has been accepted as valid in the pertinent scientific community? I don't think so, Your Honor. When we're talking about the First Amendment and the ability to publish simply the results of studies, especially when we're outside of the commercial speech context in particular. But if we're in the commercial speech context, would it matter whether or not the relevant scientific community accepts that study as being valid scientifically? No, Your Honor, and I'm not even sure how we would determine that. Well, I think there is some evidence in the record that at least some of the organized medical associations don't accept the study as a valid study. Is that fair? Is that fair to say that that's in the record? Yes, there's a debate between some of the organized medical associations on that issue. Which medical associations give their imprimatur to the study? Apollog as well as the Canadian analog to that. What's Apollog? American Association of Pro-Life OBGYNs. It's over 7,000-member professional medical organization. And the Chamber of Commerce, this Court addressed that issue in Chamber of Commerce. When you have different medical organizations, this is a Prop 65 case, when you have different medical organizations arguing over that, that's exactly what the First Amendment protects. And the Chamber of Commerce case clearly holds that debates on medical issues and scientific issues are protected by the First Amendment. The people of California deserve the right to be able to speak about scientific studies that come out without fear that the Attorney General is going to silence them, even send them to jail. But the Attorney General isn't saying that, I don't want to paraphrase the case, but they're not saying that you can't have the date. They're just saying the studies can't be misleading. They are saying their interest is to protect a vulnerable population from misleading information. Right, but for that to be a valid interest under the First Amendment, it has to also be true that it's misleading. And that's just simply not the case here. When you have a debate about scientific information, the First Amendment requires that we have open discussion, not censorship. But something can be objectively misleading, regardless of whether or not there is a scientific debate about the procedure. Something that's put out about the procedure can be misleading, regardless of whether or not everyone disagrees about the efficacy of the procedure. If there is misleading information in the communication of the procedure, that is not protected. Right. Only if you're in the commercial speech context and it's inherently misleading does it then get into that unprotected category. But we're not there. Our clients are simply repeating the conclusions of peer-reviewed studies, and they're not engaging in commercial speech. And for that reason, their speech should be protected. It is protected by the First Amendment. And we request that this Court reverse and remand. Let me just ask you this. So are you saying that if there is a study that everyone agrees is misleading, there's still a First Amendment right to disseminate that information? No, Your Honor. And that goes to – I think there is certainly – there could be a hard – where do you draw – and there's a body of evidence on the other side. Am I saying that that's always fully protected if it's misleading to customers? No. But we're not anywhere close to that case. But you would agree that that's the State's argument, that your clients don't have the First Amendment right to disseminate this information because it's misleading information. Well, their argument is basically even though all the studies point in one direction, they just say it's not good enough. Our opinion is it is good enough. And the medical associations also disagree on whether it's good enough. Let me ask you this. If we conclude that the district court did not err in determining that these studies were misleading, do you lose? No, Your Honor, specifically because it's not commercial speech. So under U.S. – So if we agree with the district court that it was commercial speech and if we agree with the district court that that speech was misleading, do you lose? Only if it's inherently misleading, not potentially misleading. If we agree with the district court that the speech was commercial and that it was inherently misleading, do you lose? At that point, yes, I think so. I just wanted to see what your position is. Thank you. Thank you, Your Honor. Any other questions? All right. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: RAWLINSON, MILLER, JOHNSTONE